UNITED STATES

v.

Glenda JONES, 245 06 4269, Sergeant (E–5), U.S. Marine Corps.

NMCM 89 1151.

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 19 Sept. 1988.

Decided March 23, 1990.

LT Fredric D. Firestone, JAGC, USNR, Appellate Defense Counsel.

LT Stephen Ponticiello, JAGC, USNR, Appellate Government Counsel.

Before BYRNE, FREYER and STRICKLAND, JJ.

BYRNE, Chief Judge:

Sergeant Glenda Jones was found guilty, in accordance with her pleas, of disobeying a general order by writing personal letters to, meeting with, and consuming alcoholic beverages with Private Carmen A. Rhodes, and using her private auto to transport Private Rhodes back to her place of duty, all in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892; of committing sodomy with Private Rhodes in violation of Article 125, UCMJ, 10 U.S.C. § 925; and of attempting to impede an investigation in violation of Article 134, UCMJ, 10 U.S.C. § 934. The military judge sentenced her to confinement for 14 months, forfeiture of $350.00 pay per month for 14 months, reduction to pay grade E–1, and dishonorable discharge from the United States Marine Corps. The convening authority, in accordance with a pretrial agreement, mitigated the dishonorable discharge to a bad-conduct discharge and suspended both the confinement and the forfeitures in excess of 6 months.

At trial, the defense timely moved to dismiss all the charges based upon the exercise of unlawful command influence. The defense motion cited, in part, the following facts:

On 12 July 1988, the case of *United States v. Sergeant Jameson*, a general court-martial, was convened to try allegations arising out of the investigation of homosexuality among female Marines in Fourth Recruit Training Battalion. At Sergeant Jameson's trial, the defense called two witnesses to testify favorably to Sergeant Jameson's "general military character." On 14 July, both Staff Sergeants Hilinski and Gurule testified as to Sergeant Jameson's favorable performance as a drill instructor as well as her rehabilitative potential.

On 15 July, the court reporter, Sergeant C.W. Nails, USMC, was directed by the prosecution to transcribe a verbatim transcript of Staff Sergeant Gurule's and Staff Sergeant Hilinski's testimony. The transcripts were then delivered to the prosecutor sometime during the weekend of 16–17 July. On 18 July both defense witnesses were summoned by their respective Battalion Commanders, and with copies of the transcripts in hand, were relieved of their duties as drill instructors due to their testimony. Subsequently, both received unfavorable fitness reports. It should be noted that they were the only two defense character witnesses at Sergeant Jameson's trial. Appellate Exhibit I.

In response, the trial counsel stated the following:

As can be seen from the attached excerpts of the record of trial in *U.S. v. Jameson*, Staff Sergeant Hilinski, in addition to testifying as to the character and rehabilitative potential of Sergeant Jameson, stated that she had "no bad opinion" of a drill instructor engaging in homosexual activity with a recruit in the days immediately following graduation. She further testified that, despite the fact that she worked in the depot inspectors [sic] office and was charged with ensuring compliance with the SOP for recruit training, she found nothing apparently wrong with a drill instructor fraternizing with a recruit during training in violation of that SOP. Staff Sergeant Gurule testified in similar fashion and, in addition, testified in essence that a drill instructor who engaged in homosexual activity with recruits could continue as a recruit trainer.

Appellate Exhibit II.

The trial counsel argued that the official actions taken against the defense witnesses in the *Jameson* case were exercises of lawful command discretion which were not aimed "at affecting the testimony of anyone or influencing this trial in any way." Appellate Exhibit II, at 4. Finally, the trial counsel asserted that the defense had not shown that any potential witness had been adversely affected nor that the accused's ability to obtain a fair trial had been impaired.

During the hearing on the motion to dismiss, other evidence on this issue was presented by the defense. Sergeant A, who had "good things" to say about Sergeant Jones, testified that she was afraid

to do so because of rumors that two drill instructors had been relieved of their duties for testifying on behalf of Marines accused of homosexuality. R. 17. Sergeant A would not believe assurances that she would not be punished if she testified, because, in her opinion, such promises had been made and broken before.

First Lieutenant F testified on the defense motion that she attended a meeting hosted by the Battalion Commander in which the relief of Staff Sergeant Gurule was discussed:

Q. [DC] Would you please tell the military judge what the substance of that meeting was?

A. One of my drill instructors, Staff Sergeant Gurule, had been relieved, not for any violation of the Uniform Code of Military Justice, but for an opinion that she had expressed. She had been called to testify for somebody else, and in testifying, she said that she would not have a problem working with a drill instructor who had been accused of a homosexual act. It was never stated whether the drill instructor had been cleared of the accusation or anything like that. It was just, "Would you have a problem working with her," and she answered no, because she had felt that drill instructor was a good drill instructor. For that expressed opinion, she was relieved.

Q. And what did Colonel Wilson indicate was the—either the proper answer or the answer that should have been?

A. The answer should have been, "No. You would not want to work. The reasons being that we have young women's lives over there, and they are entrusted into our care. We would not want to put any of them into a precarious position."

. . . .

Q. [DC] What is the current feeling among the troops that you have spoke [sic] with with regard to testifying?

A. They are hesitant to testify, because they do not want to see themselves relieved for expressing an opinion. They're unsure how they're supposed to answer questions pertaining to "would

you work with" and rehabilitative potential. They do not want to get relieved for saying, yes, they would work with a drill instructor.

. . . .

Q. [MJ] Now, you indicated that there was a—at this meeting, the Colonel indicated that no one should in any way hesitate to testify if called upon to do so?

A. Yes, sir.

Q. Did you feel in any way that that was insincere on her part?

A. No, sir.

. . . .

Q. [DC] Okay, let's go back.

A. Okay. We never discussed—the best way I can put it is that the bottom line of the meeting was that if you're going to testify and they're going to ask you questions about would you have a problem working with a drill instructor who had been put up on charges that you knew had committed a homosexual act, would you have problems working with that drill instructor in the recruit environment. The answer should be yes, you should have a problem. And we went into detail about why, because young women—we have so much power over them. They'll do almost anything we say.

Q. So the correct answer to that question, no matter what the circumstances were regarding it, if an accused had either been convicted or found guilty of that act, taking everything else, that the answer should be no if the question was put to a witness, "Would you want to work with this person again?"

A. Correct.

. . . .

Q. [MJ] I'm sorry, Lieutenant. I didn't mean to mislead you. I shouldn't have asked for your opinion. I'm saying with regard to your understanding of the policies of the Marine Corps, would such a person [a homosexual] so serve?

Again, I wasn't asking for your personal opinion.

A. Prior to me coming and speaking to Captain Puleo [appellant's counsel], I would have said no, that if they had been found guilty of committing a homosexual act, that they would not be allowed to serve because they committed a violation. But this thing about rehabilitative [sic] was something that I was unaware of. If that is an option, then it's an option. The person is punished; they are sent back out in the fleet. And if you are given that person, assigned that person, to work with, then you work with them.

R. 25–34.

A stipulation of fact contained, *inter alia*, the following:

15. Information concerning the relief of Staff Sergeants Hilinski and Gurule as drill instructors was provided to members of the press by a civilian defense counsel involved in other lesbian cases. Only after this release did the Marine Corps Recruit Depot, Parris Island Public Affairs Office respond to press inquiries concerning the said reliefs.

16. Following the local media coverage of the relief of Staff Sergeants Hilinski and Gurule, the Commanding Officer, Fourth Recruit Training Battalion, responsible for training women recruits, held a meeting with her staff and officers and encouraged everyone to testify in any judicial proceeding if called upon to do so without fear of retribution.

Finally, the parties also agreed that, in two administrative discharge boards, one general court-martial, and one Article 32 investigation, all held within a relevant time frame, military witnesses testified as to good military character and/or rehabilitative potential and that no adverse action was taken against any of them.

The military judge denied the motion to dismiss and found the following:

The actions concerning the individuals who testified in the case of the United States versus Jameson were lawful [sic] exercise of command discretion; that there is no showing that either command-

ing officer intended to influence or discourage testimony in this or other cases; that the commanding officer of the 4th Battalion held a meeting to assure her staff that they could testify without fear of repercussions; that notwithstanding this meeting and her public assurances, there is confusion as to what parameters, if any, were intended by Colonel Wilson; that this confusion was exacerbated by rumors.

Although I find there is no unlawful command influence in this case, in view of the incidental possible chilling effect, on defense witnesses, the military judge invites the defense counsel to demonstrate in what manner each particular witness may be inhibited in giving full and free testimony. I will, therefore, allow showing by counsel. However, absent such showing, I would find no influence, intentional or unintentional, proper or improper, which affects the accused's rights in this case. With regard to members, which we do not really discuss at any great length, I would advise counsel that I will not unduly circumscribe their voir dire of the members, and I would assure the defense counsel I will be very liberal in granting challenges for cause. Very well. Anything further in this regard?

DC: No, sir.

TC: No, sir.

MJ: Just to amplify a little bit, if you wish to call a witness and you wish to voir dire the witness out of the presence of the members with regard to any possible influence they may feel, you will be permitted to do so.

Unlawful command influence can be either actual or apparent, *United States v. Johnson*, 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964), and in either form it is the mortal enemy of military justice, *United States v. Thomas*, 22 M.J. 388 (C.M.A.1986). When exercised, unlawful command influence "tends to deprive servicemembers of their constitutional rights" and more specifically, if "directed against prospective defense witnesses, it transgresses the accused's right to have access to favorable evidence"

guaranteed by the Sixth Amendment. *Id.,* at 393.

 Although the rules for adjudicating command influence issues are frequently lost in condemnatory rhetoric, we discern from the cases that when the defense, at trial, raises an issue of command influence through the presentation of some evidence sufficient to render reasonable a conclusion in favor of the allegation asserted,[1] the burden shifts to the Government to prove, by clear and positive evidence, that command influence did not occur. *United States v. Rosser,* 6 M.J. 267, 272 (C.M.A. 1979); *United States v. Adamiak,* 4 U.S.C. M.A. 412, 417–18, 15 C.M.R. 412, 417–18 (1954); *United States v. Carlson,* 21 M.J. 847, 851 (ACMR 1986); *United States v. Treakle,* 18 M.J. 646, 657 (ACMR 1984). *See also United States v. Cruz,* 20 M.J. 873, 881 n. 9, 887 (ACMR 1985). If the Government is unable to do so, the military judge must find that command influence exists and must then take whatever measures are necessary and appropriate to ensure that the findings and sentence, if any, are so far unaffected by any command influence that a reviewing court would find them to be so beyond a reasonable doubt. If and only if the trial judge finds that command influence exists (because the defense successfully raised it, and the Government failed to disprove it by clear and positive evidence) and finds, further, that there is no way to prevent it from adversely affecting the findings or sentence beyond a reasonable doubt should the case be dismissed.

 In a case in which the trial court erroneously finds that command influence does not exist or proceeds notwithstanding a finding that command influence exists or has existed, an appellate court may still affirm the findings and sentence if and only if the appellate court is satisfied that the findings and sentence are unaffected by command influence beyond a reasonable doubt. *Thomas,* at 394. If the trial court finds that the defense has failed to raise an issue of command influence or that the Government has disproved the existence of command influence by clear and positive evidence, and the appellate court agrees, the issue of command influence is out of the case. If, however, the trial court erroneously concludes that the defense failed to raise the issue or fails to require the Government to disprove the existence of command influence by clear and positive evidence, an appellate court may not affirm the findings nor the sentence unless, taking the evidence most unfavorably against the Government, it is convinced beyond a reasonable doubt that both the findings and the sentence are unaffected by any command influence; otherwise, the appellate court must direct further proceedings to resolve the matter in accordance with the above principles. *Id.*

 In this case, we conclude that the defense presented evidence sufficient to raise the issue of command influence by showing that potential witnesses from the appellant's command were deterred from expressing, in the appellant's court-martial, their candid opinions regarding the appellant because of destructively adverse personnel actions taken by the command against those who had testified to favorable opinions of other accused similarly situated to the appellant. In light of the defense showing, the burden shifted to the Government to prove by clear and positive evidence that command influence was not present, but the military judge made such a finding without requiring the Government to meet its burden of proof. That, we conclude, was error materially prejudicial to the substantial right of the appellant to a trial free from command influence. *See Rosser,* at 273. Moreover, the failure of the military judge to see that the facts surrounding this issue were developed in the record precludes us from determining that the findings and sentence were unaffected by command influence beyond a reasonable doubt.

Accordingly, the record of trial is returned to the Judge Advocate General for

---

1. *United States v. Cruz,* 20 M.J. 873, 885–86 (ACMR 1985) *(en banc), rev'd on other grounds,*

remand to an appropriate general court-martial convening authority, who shall convene a limited hearing in which the parties shall be afforded the opportunity to present evidence on the issue of the existence, *vel non,* of command influence, and the military judge shall make findings of fact, rationalized as appropriate, on the issue, applying the burdens and standards of proof set forth hereinabove.[2] The authenticated record of the limited hearing, with the military judge's findings included or annexed, shall be transmitted via the convening authority for action to the Judge Advocate General for resubmission to this Court.

Judge FREYER and Judge STRICKLAND concur.

**UNITED STATES**

2. We are perplexed by the following statement in the defense motion: "On 15 July, the court reporter ... was directed *by the prosecution* to transcribe a verbatim transcript of Staff Sergeant Gurule's and Staff Sergeant Hilinski's testimony. The transcripts were then delivered *to the prosecutor* sometime during the weekend of 16–17 July. On 18 July both defense witnesses were summoned by their respective Battalion Commanders, and with copies of the transcripts in hand, were relieved of their duties as drill instructors due to their testimony." Appellate Exhibit I (emphasis supplied). Judicially noticing the contents of records of trial pending review in our court, we have determined that Major David L. Beck, U.S. Marine Corps, was the trial counsel in the case of Sergeant Jameson, the case in which Staff Sergeants Gurule and Hilinski testified, as well as this case, which was pending referral when the *Jameson* advance partial transcripts were allegedly ordered and delivered by the "prosecution." If the defense counsel actually believed that the trial counsel, who arguably would have an interest in reducing the number and assertiveness of witnesses for the opposing side, was at all involved, we are at a loss to understand why the defense counsel failed to make a record of the nature and extent of the prosecution's alleged involvement. In fairness to all parties, we trust that, in the limited hearing, either the allegation of prosecutorial involvement will be withdrawn, or a complete record of it will be made.