UNITED STATES

v.

Cheryl L. JAMESON, 560 13 1204, Sergeant (E–5), U.S. Marine Corps.

NMCM 89 1154R.

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 15 July 1988.

Decided 12 July 1991.

670

LT Wade W. Parrish, JAGC, USNR, Appellate Defense Counsel.

Maj Laura L. Scudder, USMC, Appellate Government Counsel.

Before MITCHELL, Senior Judge, and FREYER and HOLDER, JJ.

FREYER, Judge:

This appellant was convicted by a general court-martial, in accordance with her pleas, of one specification of failure to obey a lawful general order and four specifications of committing indecent acts with another, for which she was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement for one year, and reduction to pay grade E–1. Her case was the second of three tried at the U.S. Marine Corps Recruit Depot, Parris Island, South Carolina (hereinafter, "the Depot"), resulting from an investigation into alleged lesbian activity in the Recruit Training Regiment there. The essence of the appellant's misconduct is that, while a drill instructor, she met privately with a recruit who was a member of her platoon, and who she had determined would be interested in engaging in lesbian activity, and arranged for them to get together for that purpose after the recruit graduated from recruit training. The first three specifications of indecent acts refer to the consummation of that arrangement, occurring over a three-day period immediately after the former recruit's graduation, in hotels in Savannah, Georgia, and Knoxville, Tennessee. The fourth specification of indecent acts refers to acts committed both on board and in the vicinity of the Depot in the course of a seven-month lesbian relationship which she maintained with a staff sergeant stationed in a recruit training battalion there.

At the appellant's trial, two women Marine character witnesses testified in her behalf on sentencing.

—Sergeant Hilinski, a member of the Depot Inspector's staff, testified that the appellant had performed very competently and that she would be willing to work with the appellant in the future, notwithstanding her conviction. She expressed her disapproval of a homosexual relationship between a drill instructor and a recruit, but, when asked specifically about

a recruit that had already graduated, she replied: "Well, since the homosexual affair didn't happen while she was training the recruit, then I have no bad opinion of that. If it didn't happen right there, then the recruit was no longer a recruit."

—Staff Sergeant Gurule, a senior drill instructor attached to the Fourth Recruit Training Battalion, which included the appellant's platoon, testified that she had investigated a complaint against the appellant of favoritism towards the recruit involved in the first three specifications of indecent acts; that she had found the complaint to be inaccurate in a material respect, although not totally without foundation, and so had counselled the appellant; that the appellant was a very good drill instructor whom she would rate a 7 or 8 on a scale of 10; and that she would want the appellant working for her again. When asked specifically if the appellant's pleas of guilty to committing indecent acts with a recruit from her platoon would affect her willingness to work with the appellant in the future, she responded: "It would not effect [sic] the willingness to work with her, sir. I may have doubts in the beginning and watch her more closely; but I would work with Sergeant Jameson again."

At the conclusion of the appellant's trial, then-Major (now Lieutenant Colonel) D.L. Beck, the trial counsel, reported the substance of Sergeant Hilinski's and Staff Sergeant Gurule's testimony to Lieutenant Colonel W.E. Bubsey, Acting Staff Judge Advocate of the Depot (the Staff Judge Advocate being then on terminal leave incident to his prospective retirement). Lieutenant Colonel Bubsey directed Major Beck to have transcripts of the Hilinski and Gurule testimony prepared and delivered to him forthwith. Upon receipt of the transcripts, Lieutenant Colonel Bubsey promptly distributed them to the Chief of Staff of the Depot, the Depot Inspector, and the Commanding Officers of the Recruit Training Regiment and the Fourth Recruit Training Battalion.

Shortly thereafter a meeting was convened, attended by the Chief of Staff, the Depot Inspector, the Regimental and Fourth Battalion Commanding Officers, and the Staff Judge Advocate. At this meeting it was decided summarily to relieve Sergeant Hilinski and Staff Sergeant Gurule from their recruit training positions and to revoke their recruit training military occupational specialty (MOS). Mention was made at the meeting of the potential effect that adverse actions taken against defense witnesses based on their testimony alone might have on the third pending court-martial and on the several pending administrative discharge boards; it appears that no thought was given to any potential effect that such actions might have on the review process in the appellant's case.

Shortly after that meeting, actions were taken in accordance with the decisions reached thereat, and, as part of the process, adverse fitness reports were submitted on both individuals, each of whom has since obtained relief by decision of the Board for Correction of Naval Records.

On 12 February 1990, a panel of this Court ordered a post-trial hearing in accordance with Article 39(a) and *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967):

> concerning whether anyone exercised illegal command influence over those witnesses at appellant's court-martial who gave testimony on her behalf and those persons who may have been willing to make recommendations of clemency on her behalf, but who declined to do so because of command influence.

*United States v. Jameson,* No. 89 1154 (N.M.C.M.R. 12 February 1990) (unpublished order).

The court-ordered hearing was convened by the original convening authority, as permitted by the order, was conducted between 22 and 27 March 1990 at the Depot, and was presided over by Colonel Richard G. Walls, U.S. Marine Corps, Circuit Military Judge of the Mid-south Judicial Circuit. The appellant was voluntarily absent from the hearing. At the conclusion of the hearing, the military judge found for the Government in all material respects.

## I—STANDARD OF PROOF

Having concluded that the issue of command influence was raised by the information properly before them, the panel that first heard the case ordered the *DuBay* hearing described above. In likewise ordering a *DuBay* hearing in the third, and last, of the Parris Island lesbian courts-martial, *United States v. Jones*, 30 M.J. 849 (N.M.C.M.R.1990), a different panel of this Court, in consonance with their (and our) firmly held conviction that careful and specific allocation of the burdens of going forward and proof, and the risk of nonpersuasion, is procedurally indispensable to an orderly adjudication of controversies such as this, offered the following interpretive guidance:

Although the rules for adjudicating command influence issues are frequently lost in condemnatory rhetoric, we discern from the cases that when the defense, at trial, raises an issue of command influence through the presentation of some evidence sufficient to render reasonable a conclusion in favor of the allegation asserted [footnote omitted], the burden shifts to the Government to prove, by clear and positive evidence, that command influence did not occur. *United States v. Rosser*, 6 M.J. 267, 272 (C.M.A.1979); *United States v. Adamiak*, 4 U.S.C.M.A. 412, 417–18, 15 C.M.R. 412, 417–18 (1954); *United States v. Carlson*, 21 M.J. 847, 851 (ACMR 1986); *United States v. Treakle*, 18 M.J. 646, 657 (ACMR 1984). *See also United States v. Cruz*, 20 M.J. 873, 881 n. 9, 887 (ACMR 1985). If the Government is unable to do so, the military judge must find that command influence exists and must then take whatever measures are necessary and appropriate to ensure that the findings and sentence, if any, are so far unaffected by any command influence that a reviewing court would find them to be so beyond a reasonable doubt. If and only if the trial judge finds that command influence exists (because the defense successfully raised it, and the Government failed to disprove it by clear and positive evidence) and finds, further, that there is no way to prevent it from adversely affecting the findings or sentence beyond a reasonable doubt should the case be dismissed.

30 M.J. at 854.

The "beyond a reasonable doubt" standard by which the judicial acts under scrutiny must be shown to be unaffected by unlawful command influence which has been raised but not disproved by clear and positive evidence derives from *United States v. Thomas*, 22 M.J. 388 (C.M.A.1986), the leading command influence case in recent years.

■ Our immediate task, therefore, is to determine from the record of that hearing, together with the record of the original trial, whether or not the Government has proved by clear and positive evidence that unlawful command influence did not occur; and, if the Government has not so proved, to decide whether or not we, ourselves, are satisfied beyond a reasonable doubt that the convening authority's approval of the sentence has not been adversely affected by unlawful command influence.

## II—STATUTORY PROVISIONS

### A.

The principal statutory provision regarding command influence is Article 37, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 837, which provides in relevant part:

No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial ..., in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

*United States v. Fernandez*, 24 M.J. 77 (C.M.A.1987), reaffirms that the taking of a post-trial action under Article 60(c), UCMJ, 10 U.S.C. § 860(c), is a judicial act.

In addition, Article 46, UCMJ, 10 U.S.C. § 846, provides in relevant part:

The trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and oth-

er evidence in accordance with such regulations as the *President* may prescribe.

The nexus between Article 37(a) and witnesses clearly appears in cases such as *United States v. Treakle,* 18 M.J. 646 (A.C.M.R.1984), wherein the court states:

We hold that the portion of Article 37, 10 U.S.C. § 837 which forbids coercion or unauthorized influence on the action of a court-martial prohibits coercion or unauthorized influence on actual or prospective witnesses with respect to the content of their testimony [footnote omitted].

18 M.J. at 657.

 We agree, and, like the panel that first considered this case, we view unlawful command influence directed against actual or prospective providers of favorable Article 60(b)(1), UCMJ, matters as an analog of unlawful command influence directed against actual or prospective witnesses at trial. Of course, the later the stage of a case at which unlawful command influence first occurs, the less drastic the relief which may be required, because the earlier stages may be entirely unaffected, but that is the only material distinction we perceive. Consequently, when we discuss whether or not the convening authority's action was affected by unlawful command influence, what we mean in this case is whether or not the appellant was thereby deprived of favorable post-trial matters which might have induced the convening authority to take a more favorable action than straight approval on the appellant's case.

### B.

 We note the word "attempt" in the Article 37(a) phrase "attempt to coerce or, by any unauthorized means, influence ...," from which it may be argued that unlawful command influence cannot exist unless the source thereof specifically intends, with all the requisite *scienter,* to exert such unlawful command influence. Although no one has made it, we reject any such argument. While specific intent and *scienter* may be required for a successful prosecution under Article 98, 10 U.S.C. § 898 of one who violates the quoted portion of Article 37(a), an accused whose case is adversely affected by unlawful command influence, and the integrity of the military justice system in general, are just as victimized whether the source of the influence intended the adverse effects on the case or not; likewise, an accused whose case is unaffected, because the source's attempt has failed, will be denied relief, although the source may still be prosecuted for the attempt under Article 98. Consequently, whatever may be the result when an otherwise lawful command action is taken for the sole or principal purpose to influence a court-martial adversely to an accused, it is our view that, when an unlawful act of a commander or his staff proximately causes coercion or other unlawful influence upon a case, that case has been tainted by unlawful command influence, even if it is not proved that the commander or staff member concerned specifically intended to perpetrate unlawful command influence upon that case.

We deem such a rule to be not only legally sound but also systemically beneficial in adjudicating issues of command influence. Attempting to determine people's real motives and intents is quintessentially unscientific and, therefore, risky and conducive to grave injustice and actual or feigned moral outrage. Also, people, having complex personalities, may act in a single matter out of multiple motives and intents, some benign, others not so benign; hence, the attempt could easily degenerate into a mind-boggling effort to assess the relative potency of the several motives and intents found to be present. Moreover, in this case several commanders and staff members were involved, each of whom may not have shared precisely the same motives or intents as the others. Finally, we believe that the process of litigating command influence issues will benefit if it is possible to render an adjudication of unlawful command influence without concomitantly stigmatizing the perpetrators thereof as military justice outlaws.

In the instant case, there are intimations that the Marine Corps was faced with a serious situation which was having adverse consequences not only on good order and

discipline and morale within the Recruit Training Regiment but also on external relations with the families of current and prospective recruits and potentially with the media. Thus, we have no desire to attribute to the commanders or their staff members involved in this case any agenda other than the best interests of their commands and the Marine Corps, just as we have no desire to suspect the Commander of the Third Armored Division of any agenda but to rid his command of criminals. Consequently, the issue here, as it was in *Treakle* and the rest of the Third Armored Division cases, is not the ends but the means, and the effects of the chosen means, including the timing thereof, on pending cases. For these reasons, we put aside any question as to whether or not the adverse actions taken against Sergeant Hilinski and Staff Sergeant Gurule were intended as retribution for their having testified as defense witness in behalf of the appellant, and we turn to an examination of the true nature of such actions and the lawfulness, *vel non*, thereof.

### III—NATURE AND LAWFULNESS OF THE ACTIONS TAKEN

#### A.

■ One who holds a particular attitude or belief which is, or may be, relevant to a litigation, if approached by counsel or a party seeking testimony which would reveal that attitude or belief, has two choices: to disclose the attitude or belief, or to conceal it by refusing to be interviewed or by lying about it so as to avoid being called as a witness. If called to testify nonetheless, and if there is no applicable testimonial privilege, the witness has three choices: to admit the attitude or belief, to commit perjury by falsely denying it, or to refuse to testify. Of course, the very statement of these supposed choices reveals that there is, in the first instance, only one choice that is consistent with the obligation of each citizen to aid the administration of justice, and, in the second instance, only one choice that is consistent with the duty of the witness to obey the law. Consequently, however willing the witness may otherwise

have been, there can be no doubt that, once placed in the witness box and sworn, the witness, in testifying to his or her true attitude or belief, is clearly acting under testimonial compulsion in accordance with the demands of military law. Thus, while it is undoubtedly true that military personnel may, under certain circumstances, be sanctioned, and severely so, for gratuitously making public statements contrary to official policy, *see Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *see also United States v. Priest*, 21 U.S.C.M.A. 564, 45 C.M.R. 338 (1972), we simply cannot equate the testimony of a witness, even if contrary to official policy and given in open court, to extrajudicial statements gratuitously made in public. The distinction is that, in the former case, while the substance of the testimony may be contrary to official policy, the giving of it not only is not contrary to official policy but is actually required by military law; and it admits of no serious argument that that which is required by military law cannot, at the same time, be contrary to official policy, unless, of course, the policy, itself, is illegal (which the policy in this case is not). We see nothing radical or even controversial about any of the propositions set forth in this paragraph, and we doubt that, when stated as abstract propositions, as they are here, anyone would seriously think to question them.

#### B.

■ Likewise, if the testimony of a witness discloses a basis for adverse action against the witness, neither the government nor a private party is precluded from taking such adverse action as the circumstances may warrant merely because the basis therefor was disclosed during testimony, even under testimonial compulsion. *See Ullmann v. United States*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). Thus, if the testimony of either Sergeant Hilinski or Staff Sergeant Gurule had been (which it was not) to the effect that she, herself, was a lesbian; or that she, herself, had committed or solicited homosexual acts; or that she had failed to deter or

report such acts, or would do so in the future, after learning that they had occurred, were occurring, or were about to occur among drill instructors, recruits, or both, then the actions taken against her would be unassailable, because her propensities or conduct, as revealed by her testimony, would be disqualifying for her billet and her MOS, and perhaps even her retention in the Marine Corps. The distinction here is that, while the testimony would have been the vehicle by which the basis for the adverse action was disclosed, the adverse action is predicated upon the basis disclosed by the testimony, not upon the mere giving of the testimony. This is the analog of the situation discussed in the preceding paragraph, because, in each case, the problem resides, not in the giving of the testimony, nor even in the content of the testimony, but in some extrinsic matter (in this case, the attitudes and beliefs of Sergeant Hilinski and Staff Sergeant Gurule) which, under the circumstances, necessarily determines—and, thus, is exposed by—the content of the testimony. As noted elsewhere in this opinion, however, neither the testimony of Sergeant Hilinski or Staff Sergeant Gurule nor the testimony of any other witness exposed any of the disqualifications enumerated above; to the contrary, both individuals had excellent performance records, and the commanding officer of Staff Sergeant Gurule expressly denied any doubts about the latter's willingness or ability to uphold Marine Corps standards in the future.

### C.

■ In light of the principles expressed in Part III–A, any attempt to justify the adverse actions against Sergeant Hilinski and Staff Sergeant Gurule on the ground that they made statements contrary to Marine Corps policy in a public forum, or that they showed poor judgement in doing so, must fail. Since, as we have shown, their testimony was the unavoidable product of their attitudes and beliefs, the true and actual ground for the adverse actions taken against them could not have been the *legally compelled expression* of those attitudes and beliefs; [1] it could only have been the attitudes and beliefs, themselves; and we find that it was so.

### D.

The armed forces would likely be immobilized if they confined themselves to relying for the accomplishment of their diverse missions exclusively upon those who subjectively agreed with all their policies. The success of great military campaigns depends upon the willingness of subordinates at all levels to carry out everything from minute tasks to broad aims and strategies with which they do not necessarily agree, and it may also require them actively to suppress the disagreement of others, or even to feign their own agreement, therewith in the interest of fostering unity of purpose and action. It must, nevertheless, be acknowledged that, human nature being what it is, the ultimate degree of confidence may rationally be withheld from anyone whose support is not based on personal belief in the correctness and desirability of the policies to be implemented, and who may, therefore, prove to be less than "hard-core" in the face of determined opposition or, worse yet, become involved in acts of subversion and intrigue.

■ Consequently, it appears that the courts have upheld, as not inconsistent with the Constitution of the United States, the power of the President to employ an attitude test for at least commissioned military service, *Orloff v. Willoughby*, 345 U.S. 83, 92, 73 S.Ct. 534, 539, 97 L.Ed. 842 (1953), and the power of the government in general to prescribe a private belief and opinion test for other public employment, at least where the government can demonstrate an overriding interest of vital importance requiring that a person's private beliefs conform to those of the hiring authority. *Branti v. Finkel*, 445 U.S. 507, 515–16,

---

1. If it had been, certain well-established public policy considerations might become relevant. *See Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (holding that witnesses are absolutely immune from civil damage suits based on *the content of their testimony*).

100 S.Ct. 1287, 1293–94, 63 L.Ed.2d 574 (1980). Tests of this kind are probably most familiar in the area of national security, where little, if any, justification is demanded for denying the high levels of security clearances required for many sensitive positions. But, while attitude and belief tests may be constitutional, they distinctly implicate First Amendment values and will, therefore, not be lightly implied in the absence of manifest necessity or, at least, a very clear prescription by competent authority.

### E.

■ To be sure, no one has a right to a position as a drill intructor or to a recruit training MOS. *Orloff v. Willoughby.* The vulnerability of recruits is well-understood by us and is well-documented in this record. Had the Marine Corps validly prescribed as a formal qualification for all drill instructors and holders of a recruit training MOS that they entertain a negative and intolerant attitude towards homosexuality and those who practice or condone it, such prescription would almost certainly override whatever First Amendment values would be implicated, and the neutral attitudes of Sergeant Hilinski and Staff Sergeant Gurule, albeit evidenced solely by their testimony, would then be disqualifying, *per Ullmann v. United States.* We have carefully examined the criteria in Marine Corps Order 1326.6A (which we have procured to be made a part of the record on appeal) for selecting recruit training personnel and those in Parris Island Marine Corps Recruit Depot Order 1300.3N (Appellate Exhibit V) for relieving them, and we find in the materials of record not a single criterion whereby the adverse actions taken against either Sergeant Hilinski or Staff Sergeant Gurule may fairly be justified. It should be emphasized that nothing in this opinion purports in any way to restrict what is otherwise the prerogative of commanders to transfer or reassign personnel on the basis of such commanders' evaluation of individual suitability for, or performance of, duty, or simply optimum utilization of assigned personnel. The actions under review, however, are not of that character; they are, in all respects, adverse personnel actions. Even though Sergeant Hilinski and Staff Sergeant Gurule had no right to drill instructor positions or a recruit training MOS, they had the right, grounded in substantive due process—*see Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *see also United States v. Anderson,* 12 M.J. 539 (A.F.C.M.R.1981)—not to be stripped of their positions or MOS illegally and in such a manner as to stigmatize them without just cause in the process of destroying their Marine Corps careers—*cf. Harmon v. Brucker,* 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958), citing *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951). Thus, although the record does not reveal the specific grounds for the remedial actions taken by the Board for Correction of Naval Records, such actions certainly come as no surprise to us.

### IV—CONCLUSIONS AS TO UNLAWFUL COMMAND INFLUENCE AND REMEDY

### A.

■ That Sergeant Hilinski and Staff Sergeant Gurule were subjected to unlawful administrative actions obviously does not, by itself, establish that the appellant's case was affected by unlawful command influence. Before reaching any such conclusion, we must consider the record in light of not only the discussion in Part II–B but also the allocation of the burden of proof and risk of non-persuasion, as set forth in Part I. When we do so, we see that, in this case, on the record before us, the allocation of the burden of proof and risk of non-persuasion controls the result.

In addition to the summary reliefs of Sergeant Hilinski and Staff Sergeant Gurule following their testimony, while the post-trial review in *Jameson,* the trial in *Jones,* and several administrative discharge boards were pending, the Commanding Officer of the Fourth Recruit Training Battalion addressed the members of her battalion in response to a seemingly widespread con-

ception, directly attributable to the adverse actions taken against Sergeant Hilinski and Staff Sergeant Gurule, that testifying for the defense could be hazardous to one's Marine Corps career. The substance of her remarks was that persons with relevant information were encouraged to testify for the defense, but that, if their testimony deviated from Marine Corps policy, they would be held accountable for it. Although her remarks were ostensibly intended as a remedy for the foregoing conception, we think that they could only have had just the opposite effect of tending to induce her listeners, if they got involved at all, to engage in fear-based self-censorship calculated to tailor the content of their testimony to Marine Corps policy.

Testimony at the trial of Sergeant Glenda Jones [*see* military judge's finding of fact # 55(e)], the affidavit of Christine S. Taylor (Appellate Exhibit XV), and the testimony of Sergeant Hilinski at this *DuBay* hearing provide insight into the command environment resulting from the various command actions and utterances. The prosecution was permitted, over objection, to introduce evidence of the bare number of defense witnesses that testified at various administrative discharge boards, but the testimony of such witnesses was neither transcribed nor even summarized. Thus, we are unable to determine to what extent these witnesses confined themselves to Marine Corps policy, or whether or not the testimony they actually gave diverged from what they would have given but for the command environment. Moreover, the findings of the administrative discharge boards were that the respondents had not committed whatever supposed homosexual acts comprised the basis for processing; consequently, it may be inferred that the untranscribed and unsummarized testimony probably dealt with whether or not the alleged acts were committed, rather than the character or rehabilitative potential of admitted, not to mention already convicted, homosexuals. In this context, bare numerical evidence of how many witnesses testified for the respondents at those boards lacked sufficient probative value to establish its relevance to any of the issues in this case.

To summarize the key points, this record includes evidence that severely adverse and ill-timed command actions, for which we can find no legal basis, were summarily taken against two apparently truthful defense witnesses immediately after they gave testimony deemed contrary to Marine Corps policy; that such actions were soon followed by an official admonition to other potential defense witnesses that they would be held accountable for testimony which deviated from Marine Corps policy; and that the foregoing produced a command environment containing clearly identifiable elements of consternation, disillusionment, and, above all, reticence—telltale after-effects of unlawful command influence. Whether or not we, ourselves, would find unlawful command influence on this evidence is unimportant; but we cannot deny the reality that this record does, indeed, contain "some evidence sufficient to render reasonable a conclusion in favor of the allegation [of unlawful command influence] asserted," and that the Government has not disproved unlawful command influence by clear and positive evidence. While there is not direct evidence that the unlawful command influence affected, specifically, the convening authority's action on the appellant's case, neither is there reliable evidence that it did not. On the whole record, we are simply left with a reasonable doubt as to whether or not the convening authority's action was affected by unlawful command influence. Because of the rules relating to the allocation of burden of proof and risk of non-persuasion, this is enough to require corrective action.

## B.

We set aside the action of the convening authority and return the record to the Judge Advocate General in order that a new staff judge advocate's review may be prepared and a new action taken, these to be done outside the Piedmont and Mid-South Judicial Circuits by officers not in any way previously involved in this or any companion case. The appellant shall be afforded counsel and adequate opportunity

(taking into account the dispersion of potential witnesses, the delays incident to transmission through the mails, and any other logistical problems that may arise) to submit matters for consideration by the new staff judge advocate and the new convening authority. Although it would be legal for us, on this record, to affirm the findings of guilty, there appears no urgency to do so; in consonance, therefore, with the philosophy expressed by Judge Cox in his dissenting opinion in *United States v. Montesinos*, 28 M.J. 38, 47 (C.M.A.1989), we see no reason to circumscribe the discretion of the new convening authority unnecessarily. Upon promulgation of the new action, the record will be returned to the Judge Advocate General for further review by this Court.

Senior Judge MITCHELL concurs.

Judge HOLDER absent.