## UNITED STATES

v.

**Phillip D. HALL, 391 58 1318, Yeoman First Class (E–6), U.S. Navy.**

**NMCM 92 0502.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 29 Oct. 1991.

Decided 26 Feb. 1993.

LT James A. Douglas, JAGC, USNR, Appellate Defense Counsel.

Maj Laura L. Scudder, USMC, Appellate Government Counsel.

Before LARSON, STRICKLAND and ORR, JJ.

ORR, Senior Judge:

Contrary to his pleas before a special court-martial composed of officer members, the appellant was convicted of three specifications of forgery and two specifications of stealing mail matter in violation, respectively, of Articles 134 and 123, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 923, 924. He was sentenced to confinement for 3 months, forfeiture of $200.00 pay per month for 3 months, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence as adjudged and forwarded the record of trial in accordance with Article 65(a), UCMJ, 10 U.S.C. § 865(a). Before this Court pursuant to our review authority under Article 66, UCMJ, 10 U.S.C.

§ 866, the appellant has assigned five errors[1] in the conduct of his trial.

As to the first assigned error, the appellant was a first-class petty officer with 19 years of naval service stationed aboard the submarine, USS SAN FRANCISCO (SSN 771), as the leading yeoman. As part of the Government's case in aggravation, the trial counsel called the appellant's commanding officer, Commander (CDR) Michael A. Sharp, who testified why he felt it was necessary to remove the appellant from the command following his arrest by civilian authorities for using a stolen credit card and what the impact of that removal was on the command.[2] Following his testimony, CDR Sharp sought to remain in the courtroom.[3] The defense counsel, however, objected to his continued presence as a spectator based on his contentions that (1) the presence of a senior officer from the submarine community would have an undue influence on the members who were all junior officers in the same community,[4] and (2) the presence of the appellant's commanding officer would have a chilling effect on defense witnesses from USS SAN FRANCISCO who were scheduled to testify during extenuation and mitigation. The military judge overruled the objection based upon a lack of evidence and his perception that he lacked the authority to close the trial to members of the public.[5] Record at 236.

The defense witnesses during the sentencing portion of the hearing were the appellant, a lieutenant and a captain in the Chaplains Corps, and a lieutenant (junior grade) assigned as the supply officer aboard USS SAN FRANCISCO. This fourth witness, Lieutenant (junior grade) (LTJG) David Hamby, testified that he knew the appellant for about 2 years while they were both assigned to USS SAN

---

1. I. THE EXERCISE OF UNLAWFUL COMMAND INFLUENCE DEPRIVED APPELLANT OF A FAIR TRIAL.
   II. THE SENTENCE, WHICH INCLUDES AN UNSUSPENDED BAD–CONDUCT DISCHARGE, IS INAPPROPRIATELY SEVERE.
   III. THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS THE CONFESSION OBTAINED BY THE NAVAL INVESTIGATIVE SERVICE IN THAT THE STATEMENTS WERE OBTAINED AS THE DIRECT RESULT OF AN ILLEGAL ARREST. [Footnote omitted.]
   IV. APPELLANT'S COURT–MARTIAL LACKED JURISDICTION BECAUSE THE MILITARY JUDGE WAS DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION. *See generally* U.S. Const.Art. II, § 2, cl. 2; *Freytag v. Commissioner of Internal Revenue,* —— U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). BECAUSE THIS ERROR IS JURISDICTIONAL, THE ISSUE IS NOT WAIVED EVEN THOUGH IT WAS NOT RAISED AT TRIAL. *But see United States v. Coffman,* 35 M.J. 591 (N.M.C.M.R.1992).
   V. THE COURT–MARTIAL HAD NO JURISDICTION BECAUSE THE MILITARY JUDGE'S LACK OF A FIXED TERM OF OFFICE LEFT THE MILITARY JUDGE INSUFFICIENTLY INDEPENDENT TO SATISFY THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE. *But see United States v. Graf,* 32 M.J. 809 (N.M.C.M.R.1990), *petition granted,* 34 M.J. 169 (C.M.A.1991); *United States v. Coffman,* 35 M.J. 591 (N.M.C.M.R.1992). BECAUSE THE ERROR IS JURISDICTIONAL AND THE RECORD CONTAINS NO EVIDENCE OF A *KNOWING* WAIVER OF APPELLANT'S RIGHT TO AN INDEPENDENT MILITARY JUDGE, THE ISSUE IS NOT WAIVED EVEN THOUGH IT WAS NOT RAISED AT TRIAL.

2. The appellant was transferred to the staff of the convening authority, the next superior in the chain of command to the commanding officer, USS SAN FRANCISCO. The charge sheet indicates that the appellant was attached to that activity at the time the charges were preferred and the trial took place. It is not clear from the record of trial whether that transfer was for additional or permanent duty. Nevertheless, references to the appellant's commanding officer in this opinion are to CDR Sharp unless otherwise noted.

3. CDR Sharp also attempted to sit in the gallery once the court was empaneled and the trial began on the merits, but the military judge excluded him from the trial at that stage of the proceedings. Record at 160.

4. The three members consisted of a unrestricted line Lieutenant in the Regular Navy qualified in submarine warfare, a Supply Corps Lieutenant (junior grade) in the Naval Reserve, and an unrestricted line Ensign in the Naval Reserve training for submarine warfare qualification. Appellate Exhibit 10 at 3, 7, 9. None of the three officers was assigned to USS SAN FRANCISCO, but all were assigned to different U.S. Navy submarines in the chain of command of the convening authority.

5. *Contra* Rule for Courts–Martial 806(b).

FRANCISCO and that the appellant performed work for him on virtually a daily basis. He stated that the appellant did a good job, could be counted on to get his work done in a superb manner, had a typical "go-getter" attitude, and got along well with the crew. He also testified that he was "totally shocked" when he was informed of the appellant's offenses, that he felt the appellant could still be trusted and could still perform at the level of a chief petty officer (a grade the appellant had been selected for shortly after his offenses were discovered). Although LTJG Hamby thought the appellant had rehabilitative potential, he did not know if the appellant could put these mistakes behind him and "rejoin the Navy." In addition, LTJG Hamby stated that he would have a problem working with the appellant again because of the appellant's dishonesty and that the appellant shouldn't be back aboard a submarine but might be "good" somewhere else. Record at 267–270.

On cross-examination, LTJG Hamby stated that he hesitated before answering the question about trusting the appellant because "he wouldn't want him [the appellant] working in the submarine force." He also stated that while he didn't know much about the yeoman rating, he didn't think it should take 19 years to make chief. Record at 270–271.

The following dialogue ensued in re-direct examination by the defense counsel:

Q. Lieutenant Hamby, I'm going to remind you that you're under oath. Have you had a conversation with Commander Sharp of the USS SAN FRANCISCO regarding your testimony today?

A. No, not that I know of, not anything in particular.

. . . .

Q. Have you ever discussed your testimony, in any form, with Commander Sharp of the USS SAN FRANCISCO?

A. Yeah, some. I've discussed it with everybody—what you just said you were going to ask me, with everybody on the boat—well, not everybody, with the COB and the CO and the XO—anybody that asked.

Q. So people have been asking you what you're going to be testifying about?

A. No, not—well, they asked me what they were using me for, yes.

Q. And did you receive a positive or a negative feedback from Commander Sharp when you originally told him what you were originally going to testify about?

A. I guess—well, they didn't like the idea that I was testifying in the defense. So I guess, negative feedback.

Q. In fact, weren't you told you'd get into some trouble if you testified on behalf of Petty Officer Hall?

A. No, I wasn't told I would get into any trouble.

Q. What were you told?

A. It—it was jokingly. It wasn't serious—nothing was said seriously about "you're going to get fired" or anything.

Q. And what was it—

A. I forgot exactly what was said but it was a joking type thing. Nothing was ser—I mean, nothing's going to happen for me being here or I wouldn't be here.

Q. So you were joked to about this then—

A. Yes.

Q. —about your testimony today?

A. Yeah.

Q. Is that why you felt it necessary to come tell me about this two months ago?

A. No.

Q. Did you perceive it as a joke back then?

A. At the first—at first, no, but then it was.

Q. And what was this joke? You don't remember?

A. I don't remember exactly what they said but it was something about "Don't—you know—you're on the defense. You're on the wrong side." That kind of stuff. Something like that. Exactly—I don't remember the exact words.

. . . .

Q. That benign?

A. Yes.

Q. And was this coming from Commander Sharp? You say, "they." Who, in particular, took you aside?

A. Well, it was—the whole crew has been saying that kind of stuff, it just hasn't been Commander Sharp.

Q. Did Commander Sharp take you aside and discuss this case?

A. No, not aside. Anytime he said anything to me, there was several people there at the same time.

Q. And he discussed this case with you and your testimony?

A. No, not—not testimony. He's never said, "What are they asking you?" or anything like that, no.

Q. What exactly has he said to you about this?

A. Just wondering why they were using me as a defense and I said, "I don't know." Every time.

Record at 272–273. The military judge then asked the following two questions:

Q. Lieutenant Hamby ... did anything that anyone aboard your command said to you have any affect on your testimony here today whatsoever?

A. No, it has not.

Q. All right. And do you think that anyone tried to influence you to change your testimony in any way?

A. No, I don't think so. As a matter of fact, I think it was the other way. They wanted me to go ahead and testify.

Record at 273–274.

Nothing more was said of about this issue until near the end of an Article 39(a) that was held to consider sentencing instructions when the defense sought to reopen its case to present new evidence from a witness who would testify that LTJG Hamby had said that CDR Sharp told him (LTJG Hamby) not to say anything good about the appellant. The defense counsel represented that LTJG Hamby's testimony "completely flip-flopped" from the time when the defense counsel had first spoken to him and his responses at trial. Record at 287. The military judge, however, denied the request to reopen the defense case on sentencing because he did not consider the issue to be relevant and he believed both that LTJG Hamby's testimony was highly favorable to the appellant and that his responses to the judge's queries were perfectly candid. Record at 289–290.

This issue was raised again in the defense counsel's post-trial clemency petition under R.C.M. 1105, when counsel asserted that the military judge had erred in not allowing the defense to reopen its case concerning unlawful command influence. In that petition, the defense counsel stated:

A few weeks after my interview with LTJG Hamby, and subsequent to LTJG Hamby's agreement to be a defense witness, he came to my office and expressed reservations concerning testifying at the court-martial. His expression was of true concern, and he informed me that CDR Sharp ... had asked him why he was being called to testify on behalf of YN1 Hall. CDR Sharp stated to LTJG Hamby that if he said anything good about YN1 Hall his 'ass would be grass' or words to that effect. LTJG Hamby also requested that I not reveal this information as he was fearful of negative consequences. I spoke with the Prosecutor about this problem, and was at that time informed that CDR Sharp had requested to testify against YN1 Hall, and also that he desired to observe the entire proceeding. At court-martial, LTJG Hamby was nervous in his demeanor. His expected testimony in favor of YN1 Hall was severely diminished by additional negative comments LTJG Hamby made while on the witness stand. LTJG Hamby stated he did not want to work with YN1 Hall again, and that nineteen years was an awfully long time to make Chief Petty Officer. Additionally, the favorable testimony that YN1 Hall was a good worker had to be dragged out of the witness. His demeanor was clear, he did not want to help YN1 Hall. This was completely the opposite demeanor and desire from the earlier interviews the defense had with Mr. Hamby. Additionally, when asked about unlawful command influence, Mr. Hamby stated under oath that although he previously had thought the Commanding Officer was

serious in his comments about testifying, he later came to learn it was all a joke. After [the] defense rested its case, I was approached by the court reporter. [Legalman First Class (LN1)] ... Kenneth Johnson, who informed me that several weeks earlier LTJG Hamby had asked him if a commanding officer was allowed to hurt you professionally for testifying favorably in a court-martial. LN1 Johnson stated he was willing to testify, and that LTJG Hamby admitted that this was what the commanding officer had threatened. LN1 Johnson stated he was certain that based on LTJG Hamby's appearance that there was no possibility this threat was a joke....

... Additionally, CDR Sharp testified as the first government witness against YN1 Hall for sentencing.... CDR Sharp took a seat directly behind the prosecution to view the entire sentencing case ... [and] was present during LTJG Hamby's testimony....

Petition for Clemency of 14 January 1992 at 4–5. In an addendum to her initial recommendation, the convening authority's staff judge advocate persisted in her belief that the proceedings were correct and that no error had occurred and recommended that the sentence be approved as adjudged.

Before this Court, the appellant has filed a statement from LN1 Johnson in which he recounts speaking to LTJG Hamby two or three weeks before YN1 Hall's court-martial. He states that LTJG Hamby came to his office looking for YN1 Hall's defense counsel and that LTJG Hamby told LN1 Johnson that his commanding officer had told him that if he said anything nice about the accused he would not like it or words to that effect. Petty Officer Johnson states that he asked LTJG Hamby to repeat what he said and LTJG Hamby made "it very clear to me that his commanding officer would not like it if he testified, in behalf of the accused, favorably."

This Court has stated:

Unlawful command influence can be either actual or apparent, and in either form it is the mortal enemy of military justice. When exercised, unlawful command influence "tends to deprive servicemembers of their constitutional rights" and more specifically, if "directed against prospective defense witnesses, it transgresses the accused's right to have access to favorable evidence" guaranteed by the Sixth Amendment.

... [W]hen the defense, at trial, raises an issue of command influence through the presentation of some evidence sufficient to render reasonable a conclusion in favor of the allegation asserted, the burden shifts to the Government to prove, by clear and positive evidence, that command influence did not occur. If the Government is unable to do so, the military judge must find that command influence exists and must then take whatever measures are necessary and appropriate to ensure that the findings and sentence, if any, are so far unaffected by any command influence that a reviewing court would find them to be so beyond a reasonable doubt. If and only if the trial judge finds that command influence exists (because the defense successfully raised it, and the Government failed to disprove it by clear and positive evidence) and finds, further, that there is no way to prevent it from adversely affecting the findings or sentence beyond a reasonable doubt should the case be dismissed.

In a case in which the trial court erroneously finds that command influence does not exist or proceeds notwithstanding a finding that command influence exists or has exited, an appellate court may still affirm the findings and sentence if and only if the appellate court is satisfied that the findings and sentence are unaffected by command influence beyond a reasonable doubt. If the trial court finds the defense has failed to raise an issue of command influence or that the Government has disproved the existence of command influence by clear and positive evidence, and the appellate court agrees, the issue of command influence is out of the case. If, however, the trial court erroneously concludes that the defense failed to raise the issue or fails to require the Government to disprove the existence of command influence by clear

and positive evidence, an appellate court may not affirm the findings nor the sentence unless, taking the evidence most unfavorably against the Government, it is convinced beyond a reasonable doubt that both the findings and the sentence are unaffected by any command influence; otherwise, the appellate court must direct further proceedings to resolve the matter in accordance with the above principles.

*United States v. Jones,* 30 M.J. 849, 853–54 (N.M.C.M.R.1990) (footnote and citations omitted). *Accord United States v. Jameson,* 33 M.J. 669 (N.M.C.M.R.1991).

■ The prohibition against unlawful command influence in Article 37, UCMJ, 10 U.S.C. § 837, applies to command personnel other than the convening authority, *United States v. Levite,* 25 M.J. 334 (C.M.A.1987), and attempts to influence the testimony of or tampering with defense witnesses are prohibited, *id.; United States v. Rosser,* 6 M.J. 267 (C.M.A.1979), including character witnesses, *see United States v. Treakle,* 18 M.J. 646 (A.C.M.R.1984).

■ Nevertheless, the Government argues that this assignment of error is without merit because the issue was not raised at trial, that LTJG Hamby did testify in behalf of the appellant, and that he also testified that no one had attempted to influence his testimony. As to the first of these arguments, we find that the issue *was* raised at trial by the time LTJG Hamby testified during re-direct examination, and even if we did not reach this conclusion, waiver does not apply to the appellate consideration of claims of improper command influence. *United States v. Blaylock,* 15 M.J. 190 (C.M.A.1983); *United States v. Kitts,* 23 M.J. 105 (C.M.A.1986).

■ As to LTJG Hamby's actual testimony, the fallacy underlying both the Government's argument before this Court and the military judge's refusal to reopen the defense case is their reliance on LTJG Hamby's "candid" testimony on the issue whether his commanding officer had attempted to improperly influence his testimony *while that very officer sat in the courtroom listening to LTJG Hamby's re-sponses.* If military law prohibits a commanding officer from eavesdropping outside the courtroom door, as condemned by the Court of Military Appeals in *Rosser,* what can possibly be said for the actual courtroom presence of the source of the alleged influence while this testimony is being given? If "statements from subordinates on the effects of command influence ... [are] inherently suspect, not because of the credibility of the ... [subordinate] but because of the difficulty of the subordinate[ ] in ascertaining for himself the effect of any attempted command influence," *Rosser* at 272, what can be said for LTJG Hamby's testimony on this point while his commanding officer is sitting in the courtroom listening to his testimony? To the extent the Government relied on that testimony to rebut the allegation of improper command influence, the Government failed to sustain its burden and the judge erred in basing his decision on that evidence. The fact that the defense had additional evidence concerning LTJG Hamby's reaction to his commanding officer's discussions of his testimony should have prompted the judge to permit the defense to be heard further on the issue of improper command influence whether or not the judge perceived the testimony of LTJG Hamby as favorable to the appellant.

Consequently, we view the posture of this case, under the standard articulated in *Jones,* above, as one where the trial court has failed to require the Government to disprove the existence of command influence in regard to the appellant's sentence, and we conclude that there is insufficient evidence on which to determine whether the sentence was unaffected by command influence beyond a reasonable doubt. We conclude that the military judge did not err, however, in that aspect of his ruling concerning the lack of any evidence of unlawful influence on the members.

Since our present disposition of this case concerns the sentencing portion of the appellant's trial, we do not address the appellant's second assignment of error at the present time. As to the third assignment of error, we conclude no error occurred in

the military judge's denial of the defense motion to suppress the appellant's statements to an agent of the Naval Investigative Service based upon his determination that those statements were not tainted by the appellant's earlier, unlawful arrest. The fourth and fifth assignments of error are also without merit. *See United States v. Graf,* 35 M.J. 450 (C.M.A.1992); *United States v. Weiss,* 36 M.J. 224 (C.M.A.1992); *United States v. Coffman,* 35 M.J. 591 (N.M.C.M.R.1992) (per curiam).

Accordingly, the record of trial is returned to the Judge Advocate General for remand to an appropriate special court-martial convening authority, who shall convene a limited hearing in accordance with *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967), in which the parties shall be afforded the opportunity to present evidence on the issue of the existence of command influence in the sentencing phase of this court-martial. The military judge shall make findings of fact on the issue, applying the burdens and standards of proof as quoted above from *United States v. Jones.* The authenticated record of the limited hearing with the military judge's findings of fact shall be transmitted via the convening authority to the Judge Advocate General for resubmission to this Court. If the convening authority finds it impractical to hold such a limited hearing, that officer shall return the record of trial to the Judge Advocate General, with a statement to that effect, for resubmission to this Court.

Chief Judge LARSON and Senior Judge STRICKLAND, concur.