**UNITED STATES**

v.

**Allen V. LAWSON, 375 70 0676,
First Lieutenant (O–2),
U.S. Marine Corps.**

**NMCM 89 3394.**

U.S. Navy–Marine Corps Court of
Military Review.

Sentence Adjudged 25 Feb. 1989.

Decided 31 Oct. 1991.

LT Nanette M. Derenzi, JAGC, USNR, Appellate Defense Counsel.

Maj Laura L. Scudder, USMC, Appellate Government Counsel.

LtCol J.S. Uberman, USMC, Appellate Government Counsel.

Before MITCHELL, FREYER and HOLDER, JJ.

MITCHELL, Senior Judge:

Appellant stands convicted by members at a contested general court-martial of failure to obey the lawful order of a superior officer to submit a roster of checkpoint Marines before posting them, dereliction of duty by failing to post as a pair Lance Corporals Rother and Key at a tactical exercise road checkpoint, and conduct unbecoming an officer by driving a motor vehicle while drunk, while his driving privileges were revoked and while possessing an open malt beverage container. The dereliction of duty and order offenses arose during a tactical Combined Arms Exercise (CAX) conducted in the California desert. The approved sentence extends to a dismissal, forty-nine days confinement, and forfeiture of all pay and allowances.

Before this court in normal course of review appellant asserts that he was the victim of unlawful command influence from the pretrial statements and actions of the Commandant of the Marine Corps, that his conduct in regard to the posting of the Marines did not support the findings of dereliction of duty, that the opinions of two superior officers were improperly considered during the sentence hearing, that evidence of the desert search for the lost Lance Corporal Rother and of his death was improperly admitted, and that the sentence is inappropriately severe. We disagree and affirm.

## I. BACKGROUND

On 20 June 1988, appellant went to battalion nonjudicial punishment (NJP) for speeding, driving on a revoked license, and drunk driving. In July 1988, he received NJP from the Commanding General, 2d Marine Division (CG, 2d MarDiv) for other driving offenses and lying to the arresting military police. On 1 August 1988, the CG, 2d MarDiv sent a letter to Headquarters, U.S. Marine Corps (HQMC), recommending that appellant be expeditiously separated, and that he not be tendered a reserve commission.

On 30 August 1988, appellant was temporarily deployed with his battalion to a training site at Marine Corps Air–Ground Combat Training Center, Twentynine Palms, California (29 Palms). While there, he was detailed to post road guides along a route for a motorized night march. At the conclusion of the march, a road guide, Lance Corporal Rother, was not picked up. His unit did not report his absence to the battalion headquarters for about 1½ days. When the situation was reported, the battalion commander, suspecting that Lance Corporal Rother had been left in the desert, ordered a massive search for him. The search was unsuccessful.

## II. COMMAND INFLUENCE

### A. The Facts

On 2 September 1988, the battalion commander ordered his executive officer to do a Manual of the Judge Advocate General (JAGMAN) investigation into the Rother matter. These inquiries are generally done for command administrative, not criminal, purposes. The JAGMAN inquiry was completed on 12 September 1988. The executive officer recommended that NJP in the form of a letter of reprimand be imposed on appellant for dereliction in not posting road guides in pairs. On 13 September 1988, the battalion commander forwarded the report through the chain of command with the recommendation for NJP. On 17 September 1988, the regimental commander forwarded the investigation report recommending no disciplinary action until the Naval Investigative Service (NIS) completed its criminal investigation. On 5 October 1988, however, the battalion commander began NJP procedures, but appellant refused to accept NJP, as was his right. On 23 October 1988, the CG, 2d MarDiv, forwarded the JAGMAN investigation, but he did not concur in a recorded finding that LCpl Rother was an unauthorized absentee. Meanwhile, on 15 September 1988, HQMC issued an order to appellant to show cause why he should not be administratively separated in connection with the 1 August 1988 administrative separation action.

On 26 October 1988, appellant submitted a resignation, but on 3 November 1988, dereliction of duty and orders violation charges were preferred as the result of the Rother JAGMAN inquiry. On 9 November 1988, the regimental commander referred the charges to a special court-martial. Appellant's request for resignation was forwarded by the regimental commander through the CG, 2d MarDiv, to HQMC recommending approval on 14 November. The CG, 2d MarDiv, forwarded the request recommending its approval on 20 November 1988.

The record of trial shows that, by this time, the Rother incident had become the subject of heated press and Congressional coverage. The Rother family was publicly vocal regarding their understanding of the Marine Corps' treatment of their son and the slow pace of the still ongoing search for him. By mid-September 1988, HQMC had major press and Congressional inquiries to face. The Commandant was briefed on the matter by a Legislative Assistant. The latter also reviewed the JAGMAN investigation when it reached HQMC in late October 1988, as did the Judge Advocate Division. The review process at HQMC resulted in a conclusion that the JAGMAN inquiry was materially defective and needed to be redone. The Assistant Commandant of the Marine Corps (ACMC) ordered a new investigation to be done by the headquarters next senior to the CG, 2d MarDiv.

On 26 November 1988, Commanding General, Fleet Marine Force Atlantic (CG, FMFLANT), the next senior commander to the CG, 2d MarDiv, on orders from ACMC, convened another JAGMAN investigation into the Rother incident. Lance Corporal Rother's remains were subsequently found in the desert on 4 December 1988, raising the emotional pitch of existing publicity.

On 9 December 1988, the regimental commander withdrew the appellant's special court-martial referral and convened a Uniform Code of Military Justice (UCMJ), Article 32 investigation. On 19 December 1988, the regimental commander withdrew his prior endorsement of appellant's resig-

nation request. The second JAGMAN investigation was forwarded to HQMC by the CG, FMFLANT, on 24 December 1988. The second JAGMAN investigation erroneously noted that appellant was awaiting special court-martial. Article 32 proceedings began on 4 January 1989.

On 4 January 1989, the Commandant signed a strongly worded endorsement on the second JAGMAN investigation when he forwarded it to the Judge Advocate General for completion of its administrative review. This endorsement was made public on 9 January 1989, apparently to dramatize the policy implications of the Rother incident. The CG, 2d MarDiv was informed of its content on 8 January 1989. On 12 January 1989, the CG, 2d MarDiv referred appellant's case to general court-martial. Trial on the merits began on 21 February 1989.

Excerpts from the Commandant's endorsement to the Judge Advocate General are as follows:

> The American people accept the inevitability of Marines suffering injury and death in training.... However, they will not—nor should they—accept our maiming and killing their sons and daughters in so-called training "accidents". Neither will I! ...,
>
> Wasting lives through carelessness, thoughtlessness, or conscious disregard of the principles which have guided our Corps throughout its history cannot be countenanced....
>
> Lance Corporal Rother's death was not an accident. "Accidents" happen. His death didn't just happen, rather it was the culminating event in a series of acts, each consciously committed by human beings: intelligent, experienced and highly trained Marine Corps officers and noncommissioned officers. It was a certain and foreseeable result of an attitude which I intend to see erased from our Corps.
>
> Any who think they can simply drop off one of their Marines, literally or figuratively, and then not have to worry about him had better make an appoint-

ment with me, because that violates all my rules....

Those involved in this tragedy unfortunately overlooked [the basic principles of concerned leadership], and so it stands as one more example of the price paid by innocent victims for that kind of misfeasance....

It should therefore be obvious that the investigating officer cannot be a member of the organization being investigated.... That simple truth apparently escaped those charged with responsibility for ordering the first investigation.

At trial, the defense moved to dismiss because of command influence. The military judge found that the Commandant did not intend to influence proceedings, that he acted out of legitimate concern for training safety and thorough investigations, and that CG, 2d MarDiv, was not unlawfully influenced to refer the case to GCM.

Appellant admits that there is no evidence of direct or intentional unlawful influence. He asserts that the actions and words of the Commandant had that unintentional effect and created at least an appearance of improper back-channel orchestration of decisions made by subordinate commanders at various stages of this case.

### B. Command Influence: Law

■ The prohibition against unlawful command influence is rooted in Article 37, UCMJ, 10 U.S.C. § 837. It is a concept that is applied to a variety of situations ranging from the deliberate unauthorized interference of command into the court-martial process, to the most inadvertent injections of command policy statements into a trial through evidence or counsel argument, to merely an appearance that one or the other has occurred.

The law prohibiting improper command influence that has grown from Article 37 is complex and sometimes difficult to apply in cases such as this one. Improper influence can certainly undermine the rights of an accused and the fairness of a trial and needs to be prevented. Hence, the statute. If the courts interpreting and applying Article 37 are too strident and idealistic in seeking to control improper influence their

decisions can be unduly debilitating to commanders who, for fear of creating questionable legal appearances, may be frozen to inaction in situations where their leadership responsibilities demand action. *See, e.g., United States v. Hagen,* 25 M.J. 78, 87 (C.M.A.1987) (Sullivan, J., concurring) (advising commanders not to speak of matters in pending cases). This is especially true as the position and grade of the commander rise. We discern nothing from the cases, however, that prohibits a common sense analysis of these issues.

At the outset, we sidestep one issue. The convening authority has been described as being a partisan prosecutor in discharging his pretrial convening authority duties. *See United States v. Fernandez,* 24 M.J. 77, 78 (C.M.A.1987). *See also United States v. Hardin,* 7 M.J. 399, 405 (C.M.A.1979). Because of the factual basis for the command influence issue in this case, however, we need not resolve the intriguing question of whether, this being so, there is any reason why the law should prohibit a superior commander (prosecutor) from issuing "rudder orders" to his subordinate commander (prosecutor). *Cf. United States v. Blaylock,* 15 M.J. 190, 194 (C.M.A.1983) (rejecting unlawful command influence claim of a soldier whose case, originally referred to a court-martial that could not award a discharge, was referred to a BCD-special by a superior commander).

■ The fundamental policy question to be answered in command influence cases is whether a reasonable citizen knowing all of the facts of a given case would lose confidence in the military justice system and believe it unfair. *See, e.g., United States v. Stringer,* 5 U.S.C.M.A. 122, 133, 17 C.M.R. 122, 133 (C.M.A.1954); *United States v. Jones,* 30 M.J. 849, 854 (N.M.C.M.R.1990).

■ At trial, the defense first has the burden of presenting sufficient evidence to render reasonable a conclusion that command influence exists. If the military judge finds that the defense has not met that burden, the trial court may enter a

finding that command influence does not exist and proceed with trial. If the defense burden is discharged, a rebuttable presumption of the existence of improper influence arises and the proof burden shifts to the Government. The United States then becomes burdened to prove by clear and positive evidence that there was, in fact, no command influence in the case. *Jones.*

■ An appellate court may not affirm the findings or sentence unless, taking the evidence in the light most favorable to the accused, it is convinced beyond a reasonable doubt that neither findings nor sentence were affected by improper command influence. *United States v. Levite*, 25 M.J. 334 (C.M.A.1987); *United States v. Thomas*, 22 M.J. 388, 394 (C.M.A.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146; *United States v. Johnson*, 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964). If the appellate court is unable to so conclude, it may direct further proceedings to resolve the matter or grant relief. *Thomas*, 22 M.J. at 400.

■ Mere assertions or speculation are not adequate to trigger the command influence presumption. *See, e.g., United States v. Allen*, 33 M.J. 209, 212 (C.M.A.1991); *Jones.* The defense, however, need only present enough evidence to show an *appearance* of unlawful command influence affecting the case to raise the issue and trigger the rebuttable presumption. *See generally Allen* at 212; *United States v. Mabe*, 33 M.J. 200, 238 (C.M.A.1991); *Thomas*, 22 M.J. at 393–94, *Johnson*, 14 U.S.C.M.A. at 551, 34 C.M.R. at 331.

■ We discern from the precedents that command influence issues in cases such as this are best resolved by determining the nature of the questioned event or communication; the person who had contact with the case; the position held by the communicating person at the time of the contact; the type of contact that was made; the content of contact; who was contacted; the position of the person contacted and the character of that person's connection with

the case; the timing of the event or contact in terms of the progress of the case; and the reasonable likelihood of prejudice to the case from the contact.

### C. Command Influence: Discussion

■ The issue of command influence was raised and fully aired at trial, where necessary witnesses could have been called to litigate the question. The facts clearly show that appellant was the subject of several processes that were underway in several spheres. Those processes involved the past behavior and performance of duty of the appellant as well as with the disappearance of Lance Corporal Rother. We find nothing inappropriate or irregular about the Commandant's involvement in the various administrative proceedings.

The Commandant's statements were communicated generally through the media, to the Judge Advocate General via endorsement on the final JAGMAN investigation package and to several, and perhaps all, Marine commanders, including the convening authority. He did not back-channel the statements nor did he direct them at potential court members, convening authorities or other personnel who might be engaged in any disciplinary proceeding. The Commandant, in fact, gave no clue in his comments as to the appropriate specific treatment of anyone failing to abide by the traditional principles that he stated. His statements, while using the Rother incident as a clear example of a serious problem, were fundamentally and primarily general policy pronouncements on attitudes toward and responsibilities of individual leadership and the accountability for command stewardship, where he had obviously concluded from his administrative review of the JAGMAN investigation that he needed to focus some command attention. This was a proper and expected discharge of the Commandant's immense responsibility. *See United States v. Grady*, 15 M.J. 275, 276 (C.M.A.1983); *United States v. Estrada*, 7 U.S.C.M.A. 635, 638, 23 C.M.R. 99, 102 (1957). *See also United States v. Brice*, 19 M.J. 170, 172 n. 3 (C.M.A.1985). The Commandant, while strongly registering his disapproval of the leadership failures he per-

ceived, did not mandate the court-martial of anyone, nor did he require any particular kind of court-martial of anyone or that any particular disciplinary action be taken against anyone.

By the time the Commandant communicated the content of his endorsement to the field on 9 January 1989, and earlier to the convening authority on 8 January 1989, this case had gone beyond the Article 32 investigation report (6 January 1989) and was well on track for a general court-martial. The Article 32 investigation officer, a senior and experienced judge advocate, had recommended general court-martial, as had the Regimental commander. The decisions of the Commanding Officer, 2d Marine Regiment, which are pivotal to the appellant's undergoing court-martial, were dependent upon the NIS completing its investigation and the discovery of Lance Corporal Rother's remains on 4 December 1988, not on the claimed external communications, which, at the time of his decisions, were not yet in communications channels. There is nothing extraordinary about the focus on a general court-martial once a death was positively involved in the case. We conclude that the lurching start of the early disciplinary action in this case was due to the vagueness of the factual situation prior to 4 December 1988, the several administrative measures in circulation during the time that called for representations on actual or contemplated disciplinary action, and the several layers of command involved in the various procedures. The vagueness was eliminated when the remains were found.

We are convinced that the facts do not reveal any direct or causal connection between either the administrative actions taken or the policy statements by the Commandant of the Marine Corps in this case, nor would any reasonable person aware of the facts draw a contrary conclusion. The command disciplinary and administrative actions, as well as the HQMC administrative actions taken on the various proceedings affecting the appellant, were the result of decisions that had their own origin and merit. Neither the command nor HQMC actions were, nor do they appear to

have been, directed at controlling the disciplinary decisions of any subordinate commander or influencing any disciplinary proceeding.

The question remains, however, to what extent this policy statement may have inadvertently intruded into the trial.

Two court members who heard the case had very limited knowledge and recollection of the Commandant's statement or press accounts of the other matter. Significantly, they were not challenged by the trial defense counsel. Their recollection of the Commandant's released remarks was that Marines would be held accountable for their men and equipment, which they believed a restatement of long-standing Marine Corps principles. Neither member understood that there was any mandate or suggestion for the conviction of appellant.

A reviewing court is not bound by a court member's assertions that conversations and other communications would have no effect on his consideration of a particular case. *United States v. Adamiak*, 4 U.S.C.M.A. 412, 15 C.M.R. 412 (1954). The two members in appellant's court-martial, however, were subjected to thorough voir dire examination by trial defense counsel, who was apparently satisfied with their impartiality. The two members' limited knowledge of the Commandant's leadership statements, the impersonal and indirect mode of their reception of the statements, the low intensity of their recollection of the statements, and the remote timing of their exposure to the statements in relation to the trial (members not empaneled until almost two months after dissemination) distinguish this case from *Brice* (drug distribution trial interrupted to permit court members to attend a personally given "zero-tolerance" briefing by the Commandant). We are convinced beyond a reasonable doubt that the Commandant's remarks did not affect the two court members or otherwise intrude into the proceedings in any improper way.

### D. Command Influence: Conclusion

We are convinced beyond a reasonable doubt that appellant's trial was not affected by any unlawful influence.

## III. DERELICTION OF DUTY

### A. The Facts of the Offenses

During the ill-fated CAX, appellant participated in mock tactical operations. Toward the end of training, he was assigned uncomplicated duties of (1) posting road guards in pairs along a route designated for a battalion-sized motorized night movement, (2) obtaining a roster of Marines posted as road guides, and (3) providing the roster to Captain Edwards, the appellant's superior coordinator for this movement.

Appellant was Heavy Machine Gun Platoon Commander, 3d Battalion, 2d Marine Regiment (3/2). He had no prior desert training but had 20 months' experience as an infantry officer. The battalion commander, Lieutenant Colonel Robeson, was a new and inexperienced battalion commander. All company commanders were also new. Nonetheless, Lieutenant Colonel Robeson had stressed personnel accountability at all times because of harsh desert conditions and the number of key new people in the battalion. To conduct the critical movement, Lieutenant Colonel Robeson decided to use newly available terrain to move the battalion to the objective. Consequently, no plan for this movement had been written or practiced in advance. The exercise evolved as follows.

The CAX was to be conducted over two and one-half days. The first two days of objectives were taken. At the second objective, Lieutenant Colonel Robeson received and, in turn, gave a fragmentary order for a third objective. The battalion was very disorganized at this time. Timing afforded a period from 1730 to 2300 to jump off on the third objective. Lieutenant Colonel Robeson gave a short (15–minute) brief to command personnel on the myriad of things to be done and decided to shortcut normal preparedness so that the battalion could get underway before dark. It was understood that appellant had some discretion in posting guides in that he could add road guides, but they all had to be posted in pairs and on the movement route.

Lieutenant Colonel Robeson's extant policy was that following briefings, officers were to ask questions of him if they did not understand something or had any doubts about the subject matter. The appellant claims he stayed after this brief and asked some questions, but he provided no details for the record. Lieutenant Colonel Robeson testified that the appellant did not stay and did not ask mission questions. We conclude that even if appellant asked questions, they were not on matters pertinent to the road guide operation. Road guide details were set out on maps that no one in the command had seen before this time. For purposes of battalion control, Lieutenant Colonel Robeson used a unique system of two command teams—gold and scarlet. The critical events occurred on the night of 30 August 1988.

Specifically, appellant was detailed to reconnoiter the route of advance and to post road guides at four predetermined checkpoints at major road intersections. He was to post two guides at each location, a buddy system. The road guides were to prevent convoys from turning from the line of advance and getting lost. Captain Edwards was detailed to place a unit in trace of the battalion and conduct road guide recovery operations. Captain Edwards tasked appellant with providing a list of names of guides and posting points to him for use as a checklist. The roster was to be delivered before appellant departed the area to post the road guides. Appellant understood these leadership obligations but did not discharge them.

In his briefing, Lieutenant Colonel Robeson initially said road guides could be singly posted because of vehicle space limitations, but later in the brief changed his mind on this and directed paired road guides. In any event, it was clear at the end of the briefing that guides were to be posted in pairs and not separated. This was consistent with established battalion policy and, at the moment, driven by darkness and desert safety concerns. Specific and detailed instructions for road guide posting and recovery operations were not given to Captain Edwards or appellant by the battalion commander. Appellant, however, knew that another battalion, 1st Battalion, 10th Marine Regiment (1/10), which

was also to use the same route and follow his battalion, was also going to post road guides.

Fragmentary orders are not well-known in civilian life, but are common to military activities in general and tactical operations and exercises specifically. Fragmentary orders, being captives of short time periods and fast-paced movements, are not detailed and are children of a much more detailed operations order. A fragmentary order contains only the most essential information necessary to the conduct of the movement to which it relates. *See* Joint Publication 1–02, Department of Defense Dictionary of Military and Associated Terms, pg. 151. An order directs that a job be done, but does not specify how it will be done. Noel and Beach, Naval Terms Dictionary, 4th Ed. Logically, then, fragmentary orders, being less than full operations orders, rely for effectiveness on the provisions of the operations order upon which they are ultimately based, the clarity of the objective assigned, and the training, experience, judgment, and common sense of those charged with executing them. We conclude that this commander's fragmentary order in regard to the conduct of the movement and his guidance on posting road guides were adequate in detail to fix the main obligations and establish responsibility for execution.

The terrain and scheme of maneuver for this movement, as revealed in the record, are as follows. The exercise was conducted in remote and rough desert terrain in California, during late August. The exercise covered a line of movement of approximately forty miles, largely through valleys surrounded by rugged mountains. It was a straightline exercise that did not contemplate revisiting terrain through which the maneuvering commands had previously moved. There was no built-up area beyond the initial line of departure at day 1 that was within a minimum of about ten miles of any point on the route of advance. Maps reveal no apparent natural or artificial water sources. It is difficult to imagine a more remote, barren, and dangerous environment than the terrain over which this exercise was conducted. The fatal

third movement covered about twenty-three miles of administrative and operational movement. Once a command passed a point, it left behind and alone in this environment anything that did not move with the commands that passed over the particular road assigned for that portion of the exercise. Thus, if Lance Corporal Rother was not picked up by his battalion and his whereabouts were totally unknown to the tracing battalion, he was on his own against the harsh desert.

At the outset of appellant's assignment things were not smooth. One company refused to provide guides as required, leaving appellant short two guides. Scarlet leader, the battalion executive officer (Major Holm), then in control, learned of this when he found appellant still at the second objective at 1845 and facing a 1900 launch time. Major Holm told appellant to go to the offending company, get the guides and immediately get on the road. At the time appellant had been talking with a Lieutenant Liddy. Lieutenant Liddy had advised appellant to go to the offending company and pick up the guides, make a list of all guides, and post a staff noncommissioned officer (SNCO) at the rear of battalion with the list to check the recovery. Appellant apparently was unable to locate the offending unit and did not know whether their guides were on the way. He did know that he was under orders to leave before dark. Appellant still did not know what to do (even though he had seventeen Marines in his own platoon he could have used) when Major Holm found him. He finally got on the road 20 minutes late. Appellant left to post the road guides two Marines short of the requisite manpower and without having made a list of road guides and their posts. Appellant did not provide any guide list to Captain Edwards.

Marines Rother, McAdams, Adamson and Key were designated guides by Kilo Company. Their executive officer briefed them on their duty and told them they were to stay in pairs. None of them saw appellant before departure, and their names were not taken by appellant when they reported to him. When they reported for

guide duty they were simply told to board the vehicles and go.

Appellant put his best navigator, Sergeant Gardner, on the point of his column of several vehicles, while he stayed in the rear apparently because he thought that would enhance his control of his column. He told Sergeant Gardner that appellant was directed to post two guides at designated spots on the map. The column then departed on the mission. Before Checkpoint 1, Sergeant Gardner misread a rock formation and wrongly veered north (right) off the main road. The road began to thin out and soon looked nothing like a main road. He ultimately returned to the main road at Checkpoint 1 by cutting across rough terrain. Appellant followed Sergeant Gardner but stopped where the navigator turned to rejoin the main road. At first, appellant posted two guides, Lance Corporals Key and Rother at that spot, wrongly believing it to be Checkpoint 1. After scouting the bogus road for a distance, appellant became uncertain about the checkpoint. He returned to the site and picked up Lance Corporal Key. He left Lance Corporal Rother there posted at a rock about 200 yards off the main road and some four hundred yards from the designated Checkpoint 1.

Appellant then proceeded across open terrain to the real Checkpoint 1 where he joined Sergeant Gardner. He posted Lance Corporal Key there. He also drove down the plainly identifiable main supply road a short distance and talked with Sergeant Gardner, who was parked in front of an intersection sign that marked the checkpoint and, hence, the main road. We are convinced that by this time appellant knew that Lance Corporal Rother was not posted at the correct checkpoint. We also find that mission performance and speed of movement were the paramount concerns to him despite the safety emphasis in the battalion. He realized that he was behind schedule and he did not take the time to go back to Lance Corporal Rother and re-post him with Lance Corporal Key at Checkpoint 1. He did nothing about Rother until much later at the final assembly area when he realized that this was only an exercise and not real war and that safety concerns were important.

Appellant did not record Lance Corporal Rother's name or his location when he posted him at the rock. He ignored warnings about posting in pairs given by Lance Corporals Adamson and Key, reminding them that he was the senior. He did not give any instructions about the circumstances under which either guide could leave his post or how each was to consolidate for pick up after the battalion main column passed. Appellant told both guides to keep the battalion convoy on the main road, but did not tell Lance Corporal Rother where Checkpoint 1 was located (at that time appellant did not know). He told neither Marine what course directions to give the battalion if it passed by him.

At trial, appellant testified that by splitting the two guides he intended to see that the battalion would not veer off the main road the way his column had done. However, initially he testified that he thought the petered out road was really the main road. If so, there was no reason to split the guides, as they were on the main road. He did not split guides at any other nondesignated intersection. If preventing a battalion wrong turn off the main road was his motive, it was not reasonable to post one guide well beyond the main intersection where the main road and the bogus road met and past two other road branches. The obvious place to prevent a wrong turn of the battalion was the main intersection, not the middle of nowhere. It made even less sense to post guides for such a purpose and provide to them no instructions for giving route-correcting directions to the battalion column.

Appellant also testified that he did not think Rother was in jeopardy because he was posted in close proximity to Lance Corporal Key. They were both left with chemical lights, rations, and water. Lance Corporal Key at Checkpoint 1 was about 400 yards from Lance Corporal Rother and could see him in daylight. At night, Lance Corporal Key could see Lance Corporal Rother's chemical light. We do not know whether Lance Corporal Rother saw Lance

Corporal Key. The appellant apparently did not see Rother from Checkpoint 1 and it is unlikely that anyone not specifically looking at his position would see him in daylight or darkness. Appellant was not concerned that the guides might be afraid or in danger. Lost to his concern, however, was the effect of his changing the game plan in midstream when none of the necessary coordinating and guide recovery parties knew about it. This was the jeopardy of being left behind in the desert. At least the recovering party expected to look for and find guides on the main road. But what did they know of a second route? This danger should also have occurred to appellant when First Sergeant Floyd later asked him at Checkpoint 3 if appellant was posting his road guides in pairs. Appellant said he was doing that, implying that appellant knew it was an important policy, knew that he was not following orders, and knew that he did not want to admit that to the First Sergeant.

At Checkpoint 2, appellant found that the planned north route to Checkpoint 3 was impassable, so he and his navigator decided to lead the battalion along the south route. Since he was short two road guides, he left only chemical lights at that checkpoint and went on.

At Checkpoint 3, appellant posted two guides and by 2200 reached Checkpoint 4, where he posted his last 2 guides. He told these Marines that he would either pick them up or have a vehicle get them. Appellant then proceeded to the final assembly area at the north end of the route of march. Arriving there between 2200 and 2300, he told his navigator, Sergeant Gardner, to go back along the route with a vehicle, post two of his heavy machine gun platoon Marines as guides at Checkpoint 2 (manned only by chemical lights) and drop off a chemical light at each checkpoint on the road. He also told the navigator that he had split guides at Checkpoint 1 (Lance Corporals Rother and Key). Appellant told Sergeant Gardner to go there and tell Lance Corporals Rother and Key that the guide who does not have the convoy pass him is to walk over to the place where the other guide was posted. Appellant testi-

fied that he gave these orders because, on reflection, the safety of the Marines was of prime importance, though he earlier believed that his mission was first priority. The navigator told appellant that he would have to do this via administrative movement (with vehicle lights on) to have time to do it all because the main body of the battalion would be on the move up the road.

The navigator left two chemical lights at Checkpoints 4 and 3 but did not post guides at Checkpoint 2. He did not reach Checkpoint 1 because he met the battalion proceeding tactically under night vision (no lights), and he did not want to blind them with his vehicle lights. The navigator turned around and went back to the assembly area and reported to appellant. Appellant testified, however, that he thought his navigator found no Marines at Checkpoint 1.

The battalion began its tactical movement at 2300. Captain Edwards designated Lieutenant Fossett to draw a truck, pick one of his better drivers, hang chemical lights on the vehicle, assign it to follow in the rear of the battalion convoy and recover road guides who were posted in pairs along the road. Captain Edwards told Lieutenant Fossett that there were guides at the checkpoints along the road, but he did not say how many, who they were, or what companies they came from because Captain Edwards, not possessed of any roster, did not know. Nor did he appear to know what to do after recovery. Captain Edwards told him to pick up all Marines on side of road and they would sort out the recovery operation the next morning. Lieutenant Fossett briefed drivers and Staff Sergeant Dozier, the motor transport chief. Staff Sergeant Dozier picked Lance Corporal Barrett to drive the recovery vehicle. Staff Sergeant Dozier briefed Lance Corporal Barrett but made no mention of any road guides off the main road (he didn't know of any split guide posting). Neither Lieutenant Fossett, Staff Sergeant Dozier or Lance Corporal Barrett had a list of guides to recover. This created mini-

mized accountability and maximized risk to the troops.

The recovery operation started when the battalion began moving north along the road. As is not at all uncommon in such things, especially short-fused night tactical movements, there was significant overall confusion. Pertinently, no battalion vehicles went by the off-road position where Lance Corporal Rother was posted. The recovery operation was done hastily so that the recovery team would not lose contact with the battalion and become lost. Speed generated more problems. One guide described the pickup as the guides being told to "get on" the vehicle without concern for what unit they belonged to, apparently in the belief that only 3/2 guides were on the road. People were dragged aboard the vehicles. Lance Corporal Key was apparently picked up by 4th vehicle from the end instead of a recovery vehicle. Road guides posted by 1/10 (the *following* battalion) were also picked up by the 3/2 column.

Lance Corporal Key was picked up at Checkpoint 1. He was told by the driver of the vehicle to get on or be left behind. Lance Corporal Key told the driver that Lance Corporal Rother was also "out there." The driver said that Lance Corporal Key could go get him but he (Key) would be left behind. Some 1/10 Marines were on the vehicle and told Key that 1/10 might pick up Lance Corporal Rother since 3/2 had picked up some of 1/10's Marines. Lance Corporal Key, believing that 1/10 would pick up Lance Corporal Rother, got on. Another guide, Lance Corporal Adamson, waved down a vehicle and was picked up by the first vehicle in the 3/2 column. Lieutenant Fossett did not account for any of the Marines picked up (most of them left the pickup vehicles before the last stop). Captain Edwards was not debriefed by Lieutenant Fossett and assumed that all got back to their units.

Appellant watched all battalion vehicles pass through the release point. He did not see the chemical lighted pickup vehicle so he stopped Staff Sergeant Dozier. Staff Sergeant Dozier told appellant that he had picked up 6 guides, because it seemed that many jumped on the vehicle. Appellant, thinking that two guides were still at Checkpoint 4, went there and picked up two guides and took them to their company. He did not personally check the recovery vehicle for names of guides, nor did he account for them in any specific way.

At 0700 on 31 August, appellant saw Major Holm, the battalion executive officer, and asked him if all Marines had returned, a peculiar question to ask him, considering the known lack of accounting the previous night. Major Holm said everything was fine as far as he knew and that the march was smooth. Appellant did not discuss the failure to pair guides at Checkpoint 1 or the list deficiency. However, Lance Corporal Adamson, who had been a road guide during the battalion movement, noticed at weapon turn-in that Lance Corporal Rother's rifle card was still not claimed at the end of the exercise. He reported it to Platoon and was told that Lance Corporal Rother was gone on a guard detail. We conclude that this was an unfortunate misunderstanding.

The night of 31 August, the battalion commander met with his officers and stressed that three things were to be accounted for—"people, weapons and communication security material system gear"— and reports filed with him that night. At 1000 on 1 September, Lance Corporal Rother had still not turned in his weapon, so Lance Corporal Adamson reported this to his Company headquarters. At 1730, 1 September, appellant revealed Lance Corporal Rother's split posting at Checkpoint 1 when Captain Henderson, Lance Corporal Rother's company commander, confronted appellant about the missing Rother. Lance Corporal Rother was later found dead.

### B. Dereliction of Duty: Discussion

▌ The circumstances in which the appellant found himself on movement night, while a somewhat pressured, fast-moving and confusing situation, are common to tactical operations and exercises of this size and kind. Some of appellant's difficulties were of his own creation, particularly his failure to pick two of his own men and mount out with a complete unit on time.

The circumstances of this exercise were not, as the court members also decided by their findings, of such magnitude as to excuse appellant from responsibility for his failures to follow his orders. Likewise, without regard to the derelictions, criminal or otherwise, of other officers, staff non-commissioned officers and other Marines involved in the fatal tactical movement, we are convinced, as were the court members, that appellant's failure to follow his orders with a good measure of plain common sense, was a key failure in a chain of events that could have been expected to and did result in leaving a Marine in the desert, alone, at night, with no apparent capacity to link up to his own or any other command.

While not a certainty in all cases, it was foreseeable that if the appellant did not follow his orders a Marine could be left behind at night in a harsh environment, get lost, become disoriented, and die. The obedience to the orders and the application of due care were especially important where appellant knew that 1/10 was to use the same road in trace of 3/2, creating a potential for confusion. Command safety policies and pairing guidance were more than adequate to alert appellant to the importance of following orders and the dangers of a failure to comply with them and exercise good judgment in the process. Common sense had to tell him that without a roster in the hands of the recovery detail and without proper guide posting, recovery operations would be haphazard and uncontrolled. No one was in a position to verify who was posted and who was recovered. A detailed roster would have been mandated as a matter of judgment without regard to specific features of the fragmentary order.

We put substantial distance between our view of the traditional plain meaning of dereliction of duty proscribed by Article 92, UCMJ, 10 U.S.C. § 892. *See* Manual for Courts–Martial, United States, 1984, para. 16b(3), 16c(3), and dicta in the precedent of this Court, suggesting that the only standard applicable to a professional charged with a negligence-based offense is gross negligence. *Compare United States v.*

*Billig,* 26 M.J. 744, 760 (N.M.C.M.R.1988) (citing *State v. Weiner,* 41 N.J. 21, 25–26, 194 A.2d 467 (1963), applying a state statutory gross negligence standard to a medical manslaughter case) *with* Manual for Courts–Martial, United States, 1984, Part IV, para. 16b(3), 16c(3).

### C. Dereliction of Duty: Conclusion

We conclude that the evidence is legally sufficient to sustain the findings of guilty. We, as were the court members, are convinced beyond a reasonable doubt that appellant is guilty of the offenses of which he now stands convicted.

## IV. SENTENCING ISSUES

### A. Admissibility of Opinion

By the time of trial, the battalion commander, Lieutenant Colonel Robeson, had been reassigned to other duties. During sentencing, he and appellant's supervisor of 90 days, Major Murray, testified as to appellant's potential for future service. Appellant challenges the admissibility of these opinions, citing *United States v. Ohrt,* 28 M.J. 301 (C.M.A.1989). No objection was raised at trial on any grounds, raising the specter of waiver.

Major Murray, who served as operations officer for the battalion, briefly testified. He said that for a 90 day period before the desert training exercise, appellant worked for him as a liaison officer. Appellant's duties included coordination of battalion training events. He was supervised by Major Murray on a daily basis. Major Murray testified that he counseled appellant weekly. Based on his observations of appellant's reaction to counselling, Major Murray opined that appellant did not have the potential to improve his performance to the level expected of a Marine Corps officer. Trial defense counsel did not cross-examine Major Murray.

Lieutenant Colonel Robeson testified that he was appellant's battalion commander (but was not the convening authority for this case nor was he the battalion commander at the time of trial) for a short time prior to the desert exercise. When Lieu-

tenant Colonel Robeson reported to his command in July 1988, he was briefed about appellant's previous troubles. He believed that most people could be salvaged and gave appellant a fresh start. He personally assigned appellant the task of organizing the officers' professional library that Lieutenant Colonel Robeson set up in an office next to his own so he could observe appellant. Appellant did a satisfactory job, so the commander gave him a second chance by assigning appellant as Officer-in-Charge, Heavy Machine Gun Platoon. Besides filling a vacancy there, appellant would be supported by strong NCOs.

When appellant took over the platoon and began preparations for the desert exercise, Lieutenant Colonel Robeson was able to observe appellant on a comparatively infrequent basis, seeing him primarily in pre-CAX field exercises. Based on his overall observations and counseling, considering appellant's response to counseling, Lieutenant Colonel Robeson believed that appellant had been given too many chances, and that it would not be good for the Marine Corps to give him another chance. He expressed concern also over how that chance might be denied appellant by noting that appellant was still a man and had to go out and work, earn a living, and be a responsible person. While certainly based on extensive specific knowledge of appellant's character and performance, this opinion was tantamount to an opinion that appellant should be separated from the Marine Corps (which in this proceeding could only mean dismissal). *See Ohrt*, 28 M.J. at 305. The trial defense counsel, aside from not objecting to Lieutenant Colonel Robeson's testimony, did not cross-examine Lieutenant Colonel Robeson.

Major Murray's testimony was nothing more than an evaluation of appellant's performance of duty as an officer and did not directly express an opinion that appellant should receive a punitive separation. Lieutenant Colonel Robeson's testimony is a much closer issue. In any event, if we assume errors, the failures to object waived them. *United States v. Wilson*, 31 M.J. 91, 94 (C.M.A.1990). *See* Mil.R.Evid.

103(a); Rule for Courts–Martial 801(g). Neither officer was the appellant's commanding officer at the time this testimony was offered. The opinion of neither officer was referred to by trial counsel in argument on the quantum of punishment nor specifically mentioned in the military judge's instructions. The court members also had before them the performance, counselling and disciplinary history of appellant and evidence of alcohol consumption problems. Furthermore, it is evident that Lieutenant Colonel Robeson bore some degree of responsibility for this training incident and, therefore, had to be serving two conflicting masters when he testified. It is unlikely that this escaped the understanding of the court members. Finding no plain error, we apply waiver.

**B. Sentencing: Evidence In Aggravation**

█ Appellant asserts that the military judge erred by admitting the certificate of Lance Corporal Rother's death (Prosecution Exhibit 19) and a summary statement of the search efforts made and costs incurred in an effort to find him (Prosecution Exhibit 20). Specifically, appellant claims that this information did not directly relate to appellant's conduct, citing Rule for Courts–Martial 1001(b)(4), and that, in any event, the probative value of these exhibits was outweighed by their prejudicial effect, citing Mil.R.Evid. 403. At the outset, we note that at trial Prosecution Exhibit 20 was subjected to an objection sounding in relevance, but no objection premised on Mil.R.Evid. 403 was registered. No objection was registered to the death certificate. The failure to assert an objection based on M.R.E. 403 waives that issue on appeal absent plain error. Mil.R.Evid. 103(a)(1); Rules for Courts–Martial 801(g), 905(e). Since this evidence was admissible in the discretion of the military judge anyway, and we find no undue prejudice, there is no plain error.

Appellant's argument is pinioned on a tight interpretation of the word "directly" as used in Rule for Courts–Martial 1001(b)(4). He argues that any intervening influence between appellant's conduct and its impact on the victim breaks the causal

link that he sees as essential to the admissibility of evidence in aggravation. Appellant sets forth a list of influences that were also integral parts of the chain of events that led to Lance Corporal Rother's death, not the least of which is the general failure of Rother's unit to report him missing for over a day. In short, appellant equates the word "directly" with the doctrine of proximate cause.

Rule for Courts–Martial 1001(b)(4) is based on paragraph 75b(4) of the Manual for Courts–Martial, United States, 1969. Manual for Courts–Martial, 1984, app. 21, Part II, R.C.M. 1001, 1001(b)(4). Paragraph 75b was construed to limit aggravating matter to that which "goes" to the offense at bar but not to general denigrations of the accused or to unrelated incidents. *E.g. United States v. Roberts*, 18 U.S.C.M.A. 42, 45, 39 C.M.R. 42, 45 (1968); *United States v. Potter*, 46 C.M.R. 529, 531 (N.C.M.R.1972). Rule for Courts–Martial 1001(b)(4) contemplates the use of evidence showing the gravity of an offense and its consequences to the military mission. *United States v. Antonitis*, 29 M.J. 217, 220 (C.M.A.1989). *See United States v. Gordon*, 31 M.J. 30 (C.M.A.1990).

The record of trial and the preceding portions of our opinion make clear that the appellant committed derelictions in the performance of his duties that were key links in a direct chain of many events that tragically resulted in Lance Corporal Rother's death. The search and death were directly related to, and resulted from, the appellant's dereliction and orders offenses. There is no merit to his argument that the death certificate and the tally of search costs should have been excluded. *See generally United States v. Glazier*, 26 M.J. 268 (C.M.A.1988); *United States v. Sadinsky*, 14 U.S.C.M.A. 563, 34 C.M.R. 343 (C.M.A.1964).

C. Sentencing: Conclusion

On these facts, we also have no trouble finding the approved sentence appropriate.

V. DISPOSITION

Accordingly, the findings and sentence as approved on review below are affirmed.

Judge FREYER, concurs.

Judge HOLDER, absent.